**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**GEORGE T. TOOLE,**

       **Petitioner,**

**vs.**

                               **CASE NO. 4:08cv241-MP/WCS**

**WALTER McNEIL,**

       **Respondent.**

_____/


**REPORT AND RECOMMENDATION**

      This is a petition for writ of habeas corpus filed by George T. Toole pursuant to

28 U.S.C. § 2254.  Doc. 1.  Petitioner challenges his convictions after a jury trial for

three counts of sexual battery upon a child between the ages of twelve and eighteen by

a person in familial or custodial authority.  The convictions were in the Circuit Court of

the Second Judicial Circuit, in and for Leon County, Florida, case number 02-2223-AF.

Respondent filed an answer and the record  in paper form.[1]  Doc. 10.  The record was

expanded by the filing of an FDLE report attached to document 13.  That report is to be

_____

        [1] References herein to exhibits are to the paper record that was filed with
document 10.

considered as it may relate to the exhaustion of state court remedies as to ground three in the petition. *See* doc. 16. Petitioner was afforded an opportunity to file a traverse but has not done so. Doc. 17. Respondent concedes that the petition was timely filed. Doc. 10, p. 7.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court. 28 U.S.C. §§ 2254(b)(1), (c)." O'Sullivan v. Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 1730, 144 L.Ed.2d 1 (1999). To properly exhaust remedies as required by § 2254(b), "the federal claim must be fairly presented to the state courts." Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (*citing* Picard). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).[2]

While it is not necessary that the petitioner cite "book and verse" of the Constitution, the state court must be alerted to the fact that a federal constitutional claim is raised. Duncan, 513 U.S. at 365-366, 115 S.Ct. at 888 (citations omitted); *see also* McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005) (holding that a petitioner must "do more than scatter some makeshift needles in the haystack of the state court record") (citations omitted). The petitioner also "must give the state courts one full

---

[2] If no constitutional claims are raised, then §2254 is inapplicable and the exhaustion inquiry is irrelevant. Engle v. Isaac, 456 U.S. 107, 120, n. 19, 102 S.Ct. 1558, 1567, n. 19, 71 L.Ed.2d 783 (1982).

opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999); Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (applying this one complete round requirement to state collateral review process as well as direct appeal).

If a claim was not fairly presented but is procedurally barred from further state court review,[3] Petitioner must demonstrate cause for the default and actual prejudice, *or* demonstrate that the constitutional violation has probably resulted in conviction of an innocent person.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2565, 115 L.Ed.2d 640 (1991); McCleskey v. Zant, 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470-71, 113 L.Ed.2d 517 (1991).

For a claim which was fairly presented and adjudicated on the merits by the state court, the state court's factual determinations are presumed correct unless the Petitioner rebuts the presumption by clear and convincing evidence.  § 2254(e)(1); Fugate v. Head, 261 F.3d 1206, 1215 and n. 11 (11th Cir. 2001) (citation omitted). Section 2254(e)(2) provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
>   (A) the claim relies on –

---

[3] Procedurally defaulted claims are considered technically exhausted because state court remedies no longer remain "available."  The court therefore refers to "fairly presented" claims as having been *properly* exhausted, to distinguish them from claims exhausted by procedural default.  *See* O'Sullivan, 526 U.S. at 848, 119 S.Ct. at 1734.

(i) a new rule of constitutional law, made retroactive to cases
on collateral review by the Supreme Court, that was
previously unavailable;  or

(ii) a factual predicate that could not have been previously
discovered through the exercise of due diligence;  and

 (B) the facts underlying the claim would be sufficient to establish by clear
and convincing evidence that but for constitutional error, no reasonable
factfinder would have found the applicant guilty of the underlying offense.

As explained by the Supreme Court, "[i]If there has been no lack of diligence at

the relevant stages in the state proceedings, the prisoner has not 'failed to develop' the

facts under § 2254(e)(2)'s opening clause, and he will be excused from showing

compliance with the balance of the subsection's requirements."  (Michael) Williams v.

Taylor, 529 U.S. 420, 437, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000).

> For state courts to have their rightful opportunity to adjudicate federal
> rights, the prisoner must be diligent in developing the record and
> presenting, if possible, all claims of constitutional error.  If the prisoner fails
> to do so, *himself or herself contributing to the absence of a full and fair
> adjudication in state court*, § 2254(e)(2) prohibits an evidentiary hearing to
> develop the relevant claims in federal court, unless the statute's other
> stringent requirements are met.  *Federal courts sitting in habeas are not
> an alternative forum for trying facts and issues which a prisoner made
> insufficient effort to pursue in state proceedings.*  Yet comity is not served
> by saying a prisoner "has failed to develop the factual basis of a claim"
> where he was unable to develop his claim in state court despite diligent
> effort.

529 U.S. at 437, 120 S.Ct. at 1491 (emphasis added).

Further, a petitioner is entitled to federal habeas relief only if the state court's

adjudication of the merits of the federal claim:

(1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States;  or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000); Ramdass v. Angelone, 530 U.S. 156, 120 S.Ct. 2113, 2119-20, 147 L.Ed.2d 125 (2000).

> The "contrary to" clause in § 2254(d)(1) "suggests that the state court's decision must be substantially different" from the relevant Supreme Court precedent. Although a state court's decision that "applies a rule that contradicts the governing Supreme Court law is "contrary," a state court decision that applied "the correct legal rule" based on Supreme Court law to the facts of the petitioner's case would not fit within the "contrary to" clause even if the federal court might have reached a different result relying on the same law. In evaluating the "'unreasonable application' inquiry," the federal court should consider whether the state court's application of the law was "objectively unreasonable" and should not apply the subjective "'all reasonable jurists'" standard. The Supreme Court clarified that, under 28 U.S.C. § 2254(d)(1), the federal court may not issue the writ unless it finds that the state court applied Supreme Court law unreasonably.

Fugate, 261 F.3d at 1216 (summarizing the conclusions in Williams, citations omitted).

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066. Petitioner has a heavy burden, as he must show that "no competent counsel would have taken the

action that his counsel did take." Fugate, 261 F.3d at 1217 (citation omitted). There are no rigid requirements or absolute duty to investigate a particular line of defense, and "more is not always better." *Id.* (citations omitted).

Even if Petitioner can show deficient performance, he must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068.

While Strickland explained the performance and prejudice prongs of analysis, the court need not address them in that order or even address both, as failure to demonstrate either step of Strickland is dispositive of the claim against the petitioner. 466 U.S. at 697, 104 S.Ct. at 2069.

**Ground One**

Petitioner contends that he was deprived of effective assistance of counsel because his attorney allowed a biased juror to remain on the jury. Doc. 1, p. 4. The juror in question, a Mr. Arbona, informed the court that he had met the victim, L.B.,[4] "at least a dozen times as a result of being employed by the victim's family" by a heating and air conditioning company. *Id.*, p. 5. Petitioner asserts that his attorney was ineffective in his questioning of this prospective juror, failed to involve Petitioner in the decisions involving the seating of this juror, and failed to move to strike the juror for

---

[4] The victim, L.B., was a wheelchair bound, developmentally disabled, 15 year old child with cerebral palsy. Doc. 10, p. 2. The transcript reveals that the victim was able to speak and communicate adequately.

cause. *Id.* Petitioner states that the juror became the foreperson. *Id.* Petitioner

asserts that he raised this ground in his second Rule 3.850 motion, but not in the first

motion. *Id.*, pp. 3-4.

Respondent likewise argues that Petitioner failed to raise this claim in his first

Rule 3.850 motion. Doc. 10, p. 8. Respondent notes that the trial court denied the

motion on procedural grounds as an impermissible successive Rule 3.850 motion. *Id.*

Respondent contends, therefore, that the claim is procedurally barred. *Id.*

Respondent is correct. This claim was not presented in the first Rule 3.850

motion filed on October 29, 2005. Ex. P, pp. 3-12 (first Rule 3.850 motion claims). It

was presented in the second Rule 3.850 motion, entitled "Amended 3.850 motion for

Postconviction Relief" filed on March 7, 2008. Ex. Y, p. 7. The trial court denied the

"amended" Rule 3.850 motion. Ex. Y, pp. 13-14. The court ruled:

> A rule 3.850 motion may be amended at any time <u>prior to the trial court's ruling</u> as long as the amended motion is filed <u>within the two-year limitation period</u> prescribed by rule 3.850(b). *Kline v. State*, 858 So. 2d 1257 (Fla. 1 DCA 2003) (emphasis added). Defendant's amendment is neither prior to the trial court's ruling nor within the two-year limitations period.

Ex. Y, pp. 13-14 (emphasis by the court). The court further ruled that because an

amendment was not allowed, the second Rule 3.850 motion was barred as successive

and an abuse of the writ. *Id.*, p. 14. The state court, therefore, did not reach the merits

of this federal claim. That ruling was affirmed *per curiam* on appeal. Ex. Z.

Consequently, Petitioner's first ground is procedurally defaulted. Petitioner has

not shown cause or prejudice for the default. Thus, this court may not reach the merits

of the claim.

**Ground Two**

Petitioner asserts that he was denied effective assistance of counsel because his attorney did not adequately impeach L.B. with his prior inconsistent statements. The statements at issue were made by the victim to family and child care workers that the blood "in his urine" was the result of Petitioner's sexual abuse. Doc. 1, p. 7. Petitioner contends that these were false statements because the victim's step-father was the assailant. *Id.*

Respondent contends that this claim is procedurally barred because it was not sufficiently pled on appeal from denial of Petitioner's first Rule 3.850 motion. Doc. 10, p. 16. Respondent points out that Petitioner's entire claim in his initial brief on appeal was:

> Ground 5. Counse [sic] Failed to Impeach Credibility Of Key State
> Witness's Fabricated Statements.
> See this Court's file for Arguments of Ground 2.

Ex. R, p. 5.

Ground 2 in the same initial brief on appeal from denial of the first Rule 3.850 motion argued that counsel was ineffective for failing to challenge the *competency* of the child victim to testify. *Id.*, pp. 2-4. None of that argument clearly relates to prior inconsistent statements of the victim. *Id.* Ground 2 as alleged in the Rule 3.850 motion itself, however, sets forth several statements by the victim which Petitioner argued to be evidence of his lack of competence to testify. Ex. P., p. 5. Further, in ground 5 of that motion, which was the same ground the denial of which Petitioner challenged on his appeal, Petitioner alleged:

> L.B. initially made out-of-court statements to family and investigators that
> he had urinated in his bath water and discovered blood, and thereafter
> related this condition as a result of abuse by the defendant (A IR#4).
> *Later L.B. admitted that he had fabricated these statements* (in collusion
> with his stepfather most likely) to cover up sexual abuse by his stepfather.

Both had become alarmed when discovering blood in L.B.'s semen after ejaculation (B IR#9,#10). Thus, the out-of-court statements L.B. made to family and investigators, initially relating blood found in his bath water and underwear to the defendant, were conclusively unreliable, and highly prejudicial to the defense. Counsel had a duty to impeach L.B. regarding his fabricated statements that reached to the core of the initial investigation and charges. . . .

Ex. P, p. 8 (emphasis added). Given the *pro se* status of Petitioner, the appellate court could have returned to ground 5 in the Rule 3.850 motion and understood the specifics of the claim, at least to the extent it was made in the Rule 3.850 motion. The procedural default argument, therefore, is not a strong argument.

The court need not so rule, however. As noted earlier, the court may reach the merits of a claim to deny it, notwithstanding a failure to exhaust state court remedies as to the claim. That is the easier course here.

The trial court denied ground 5 as set forth in the Rule 3.850 motion. The court reasoned:

As shown by the record, counsel did attempt to impeach the victim with his prior statements during counsel's thorough cross-examination. TT 267-280.

Ex. P, p. 160.

The cross examination of the victim, L.B., conducted by Petitioner's attorney was thorough. Counsel first directed L.B.'s attention to the time that his father, mother, or stepfather "saw some blood in the bathtub and then your underwear, they took you down to the Child Protection Team," and L.B. said yes, after I told them. Ex. D, p. 267. L.B. admitted that when his mother asked what was going on, he became upset and would not tell her. *Id.*, pp. 267-268. He said that he told his mother that Petitioner "had done something" to him "down there." *Id.*, p. 268. He admitted that he then asked his

mother to leave so that he could talk about it with his stepfather, and after that, he was taken to the child protection team. *Id.* L.B. agreed that the next day he gave a videotaped statement to a "nice lady from the Child Protection Team," and when asked, "[a]nd you told her that Mr. Toole had done some of these things to you that you described to the jury today," he said yes. *Id.*, p. 269.

Counsel then asked:

Q. And then at the end of that interview, isn't it true that she asked you if anybody else had ever done something, touched you in the wrong way?

A. Yes, sir.

Q. And you said that your stepfather, Harry Raker, had?

A. Yes, sir.

*Id.*

Counsel then established that a second interview was conducted at the office of the Child Protection Team, and after that, L.B. went into the bathroom with his stepfather and he and his stepfather were whispering. *Id.*, p. 270. Counsel then had L.B. admit that what he said the first time about his stepfather (that he had touched him in the wrong way) was true. *Id.*

Counsel then asked:

Q. But, then later on you told the investigators and the Child Protection Team that that wasn't true?

A. Because that's what he told me to day. And then I went ahead and told the truth.

Q. Okay. So, you first said he had sexually molested you, then you said he did not sexually molest you, then you said he did sexually molest you?

A.    Sir, may I explain something?

Q.    Certainly.

A.    Okay.  He told – my stepdad told me to tell them that nothing
      happened.  And then later on, I felt like that I wanted to tell
      them the truth.  So, when I got the chance I told – I mean, I
      told Mike DeVaney and them the truth.

Q.    And the truth was that your stepfather was sexually abusing
      you?

A.    Yes, sir.

                    *              *              *


A.    Okay.  This goes for everybody in this courtroom.  That's not
      the only reason,[5] you know.  And I'll tell you again I wanted
      to tell on Mr. Toole [Petitioner] and my stepdad because that
      wasn't right.

Q.    Okay.

A.    That was not right.

*Id.*, pp. 270-272.  L.B. agreed he was currently living with his biological father.  *Id.*

      Counsel continued:

Q.    And after you told the Child Protection Team that your
      stepfather didn't do anything to you, didn't you get a new
      gift?  Something white that's going to get bigger?

A.    Yes, sir.

Q.    A puppy?

A.    Yes, sir.

_____

      [5] The "other reason" was that L.B. wanted to move back to live with his biological
father.

Case No. 4:08cv241-MP/WCS

*Id.*, p. 272. L.B. then said that it was his stepdad who taught him to "shoot off," and he said that this testimony was the truth. *Id.* Counsel then asked L.B. whether he had, at another time, said it was Petitioner who taught him to "shoot off," and he said: "Yes, sir. But, I actually learned it from my stepdad." *Id.*, p. 273. He admitted that he had lied earlier about Petitioner's involvement in that. *Id.* He then said that "Mr. Toole is the one that taught me how to go in the back side." *Id.* L.B. denied that he said that Petitioner did those bad things to protect his stepfather. *Id.*, pp. 273-274.

> L.B. then explained:
>
> A.     See, my stepfather taught me how to shoot off. And, you
>        know, I'm going to be real honest with you. I don't want to
>        see Mr. Toole get away with what he did to me because
>        that's not what I wanted to do.
>
>        And this leads back to my stepfather. I didn't know how to
>        tell him that I didn't want to shoot off.

*Id.*, p. 274. L.B. then was confronted with a prior statement, that his stepfather had "never in a million years done that" (taught him to "shoot off"), and remembered saying it, but said it was a lie. *Id.*, pp. 274-275. L.B. was also asked to confirm that he had previously made that statement, and he said that when he was nervous, he would say anything "that hits the top of my mind." *Id.*, p. 277. Counsel for Petitioner concluded his cross examination of L.B. by asking how the jury could believe him after L.B. had told "all the lies you told about your stepfather on three or four different occasions," but an objection to question was sustained. *Id.*, p. 280.

In summary, the cross examination of L.B. by Petitioner's attorney fully explored every inconsistency in the victim's prior statements, and specifically covered L.B.'s prior assertion that it was Petitioner who had molested him on the occasion that blood was

found. Petitioner has not come forward with any additional questions that his attorney should have asked of L.B., or of any other witness, and has not shown how answers to those questions could have affected the outcome. Consequently, Petitioner has not shown that the state court's ruling on this constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

**Ground Three**

Petitioner contends that he was denied due process and equal protection of the law because the prosecutor used false testimony at trial. Doc. 1, p. 8. Petitioner asserts that the prosecutor knew that there was a Gadsden County investigation "as to the step-father being the sexual abuser of the victim, not the Petitioner." *Id.* Petitioner asserts that the investigator knew that L.B. said that his stepfather had had sexual contact with him (masturbating L.B.), "and both were surprised to find blood in the child's urine. Additionally, the child informed DeVaney [the investigator] that he had lied about Petitioner to cover for his step-father's sexual abuse." *Id.* Petitioner states that L.B. told the investigator that his stepfather, Harry Raker, was the abuser, not Petitioner, and thus "the State was aware the testimony used at trial was false." *Id.*

This is not an equal protection claim. It is a due process claim. The Government's knowing use of false testimony violates due process. Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), citing Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935), Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942), and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

Mere inconsistency of statements is not perjury, and not every inconsistent statement is material. United States v. Nelson, 970 F.2d 439, 442 (8th Cir.), *cert. denied*, 506 U.S. 903 (1992); United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995). In Tejada v. Dugger, 941 F.2d 1551 (11th Cir. 1991), *cert. denied*, 502 U.S. 1005 (1992), the Eleventh Circuit said:

> We are also unconvinced that the use of Ortiz's testimony was false in the *Giglio* sense. Unlike in *Giglio*, where the government failed to disclose a promise made to a key witness and then depended almost entirely on that key witness' testimony, in the instant case Tejada was fully aware at trial of the already conflicting sworn statement and deposition and of the inconsistency between Ortiz's testimony and his earlier statements. Furthermore, at trial Tejada's counsel brought out on cross-examination the inconsistency between Ortiz's testimony and his earlier sworn statement. So, because the jury was made aware of the inconsistency, the "false" testimony could not affect the judgment of the jury.

941 F.2d at 1557 (citations omitted).

It is conceivable that Petitioner defaulted on this claim. The Rule 3.850 court ruled that "Defendant's claim is facially insufficient and does not rise to the level of a *Giglio* violation because he does not identify specific testimony he believes is false or state a basis for any testimony being false." Ex. P, p. 161. Respondent, however, addresses the merits. Doc. 10, pp. 23-25. I will likewise address the merits.

The record reflects that prior to trial, Petitioner was given a copy "the" FDLE investigative file. Ex. D, pp. 71, 73. Petitioner also had the psychological assessment of L.B. by Dr. Thomas J. Knobbe, which discussed "the victim's allegations and recantations of them in-depth." *Id.*, p. 9.

The FDLE information was given to Petitioner and his attorney in conjunction with a motion in limine filed by the prosecutor to exclude any evidence into the investigation

of sexual abuse by Harry Raker, the stepfather of L.B. *Id.*, p. 74. The gist of the motion was that there was a Child Protection Team (CPT) interview of L.B. in a "spin-off" case involving allegations of sexual abuse by L.B.'s stepfather, Harry Raker. *Id.* The motion in limine itself is found at Ex. B, pp. 25-29.[6] Petitioner's attorney said that there was a Child Protection Team audio tape of the interview with L.B. in this "spin-off" case, and the prosecutor said that "there should be a CPT summary of the tape included in the packet." *Id.*, pp. 72-73. During the argument, it is plain that Petitioner's attorney and Petitioner were fully aware that after first accusing Harry Raker of sexually abusing him, L.B. had recanted after he returned home and was again in the custody of his stepfather. *Id.*, p. 75. Also, there was some evidence (from observations by members of the Child Protection Team) that right after L.B. had accused his stepfather, his stepfather took him into a bathroom and, shortly thereafter, L.B. came out and was crying. *Id.*

In ruling on the motion, the court explicitly stated that the allegation against Raker was that he had taught L.B. to ejaculate. *Id.*, p. 79. The court noted that L.B. repeated the allegation, but then later the same day, said he made a mistake. *Id.* The court noted that he again recanted the allegations in two interviews by Dr. Knobbe. *Id.* The court observed that "admittedly" the issue was confused by L.B.'s apparent desire "to live with his [biological] father." *Id.* The court then noted that when L.B. was interviewed again by FDLE Agent DeVaney, he "went back to what he had said to start with on June 14h in the CPT interview." *Id.*, pp. 79-80. The court then reasoned that

---

[6] The motion and memorandum are also supplied as Petitioner's Exhibit 2 to document 13.

the testimony had to be allowed because in the August 13, 2002, interview with Agent

DeVaney, there was "discussion that perhaps blood in the bathtub that was seen on

June we may have related to the incident with the stepfather as opposed to the incident

with Mr. Toole." *Id.*, p. 80. The court further noted that Raker was arrested on August

14, 2002, and charged with an offense on June 12, 2002, two days after the alleged

date "in this incident" (sic, the CPT interview). *Id.* The court denied the motion because

the two cases were so intertwined and the defense had the right to test L.B.'s credibility.

*Id.*, and p. 79.

Petitioner now argues that while his attorney had a copy of the FDLE file in his

own case, he did not have a copy of the FDLE file in the Raker case. Doc. 13, p. 4. He

has attached and made a part of this record the FDLE file from the Raker case, which is

FDLE file number TL-20-0053. Doc. 13, Petitioner's Exhibit 1. The file in Petitioner's

case ended in the number 52. *Id.* The FDLE file in Raker's case reflects that on August

13, 2002, Agent DeVaney interviewed L.B. with respect to accusations L.B. had made

on June 14, 2002, against Harry Raker when he was interviewed by the Child Protection

Team. L.B. told DeVaney that on June 12, 2002, when Raker reported to L.B.'s mother

that he had "urinated blood in the bathtub," what had really happened was that Raker

had "helped him 'shoot off' while he was being bathed in the bathtub." April 13, 2002,

report, serial # 10 (doc. 13, p. 8 on ECF). L.B. said at that time that he would testify

against Raker. *Id.* Raker was charged and arrested. *Id.*, serial # 11 (doc. 13, p. 11).

DeVaney next reports that L.B. then decided not to testify against Raker because it

would put his sister's father in prison, but he did not recant his accusation against

Raker.  *Id.*, serial #12 (doc. 13, pp. 14-15 on ECF).  The charges against Raker were dismissed.  *Id.*

In summary, the evidence from the Raker FDLE investigation is exactly the same as the evidence discussed when the motion in limine was considered.  Petitioner and his attorney had this evidence in Petitioner's own FDLE investigation file, and he may have also had the Raker FDLE investigation file.  Further, Petitioner's attorney had access to all of the victim's prior inconsistent statements because he covered them in his cross examination of the victim, as discussed above.  From L.B.'s trial testimony it was shown that L.B. had made prior inconsistent statements, and his trial version was that both Petitioner and his step-father had sexually assaulted him, although each in different ways. There was no violation of due process and no *Giglio* claim.  Ground three is without merit.

**Certificate of Appealability**

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. § 2254 11(b).

I find no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

**Conclusion**

Accordingly, it is **RECOMMENDED** that 28 U.S.C. § 2254 petition for writ of habeas corpus filed by George T. Toole challenging convictions for three counts of sexual battery upon a child between the ages of twelve and eighteen by a person in familial or custodial authority in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 02-2223-AF, be **DENIED WITH PREJUDICE** and that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

**IN CHAMBERS** at Tallahassee, Florida, on November 4, 2010.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:08cv241-MP/WCS